v. City of Lawrence, Massachusetts, et al. Good morning, Mr. Lichten. Good morning. My name is Harold Lichten. I have the pleasure of representing the plaintiffs in this case. I'm going to take 20 minutes and ask to reserve two minutes for rebuttal. I'm going to address the issues of validity and less discriminatory alternatives. My co-counsel, Steve Churchill, will address the question of adverse impact. The first two points I would like to make, Your Honor, is if the written multiple choice rote memory job knowledge test that the court found valid in this case were to be upheld on appeal, then the result around the country would be no less than to resegregate the superior ranks of police departments around the country because it is known to a scientific certainty, as all of the experts in this case agreed, that a written multiple choice job knowledge rote memory test has a severe and unrelenting adverse impact on minority candidates. Can you just briefly tell me why that's the case? Well, that's an interesting question, Your Honor, and the experts in the case said no one knows for sure whether it's the way minorities learn things, sort of street knowledge as opposed to book knowledge. No one knows whether it's because of inferior schooling that minorities have. All of the experts agreed that these statistics are overwhelming. They're known throughout the social science research. The defendant's experts agreed with that, but no one knows exactly what the cause is. I would say the defendant's own expert, Dr. Hoods, said that when minorities are given questions not by multiple choice rote knowledge, but in a way that puts the question in context, sort of situational judgment test, which he's a big backer of. Minorities do much better on this test, but that wasn't the test that was given in this case. Is that true through all minorities? I mean, we're talking about a big country with a lot of different minorities, although I realize it's true everywhere, and that is why, literally, in all of our research and in all the testimony in the case, we don't know one large city in the United States that uses a multiple choice job knowledge rote memory test as the only way to determine who becomes a police superior officer. Boston stands alone in that respect. When you say stands, you're using present tense. I'm saying at the time in 2005 and 2008. And so what is this case now? You didn't move for preliminary injunctive relief. We're now almost 10 years after the 2005 test. If we were to reverse, what happens? They're not using the test anymore, are they? Well, it's not clear what they're going to use going forward. But they have gone forward. Hasn't there been an interim exam? They waited for six years to see the result of this case. This case went on and on. The district court took three and a half years to decide it. They then gave another test in 2014 that had additional aspects. However, the commissioner testified in that case, the new commissioner, Evans, that I'm an 80-20 guy today, now, and forever, and the city may likely go back to that. They're less expensive if the score were upheld. But to answer your question, that doesn't have anything to do with the question of remedy. There would still be a remedy. We haven't gotten to that, but there would still be a remedy. What conceivably would the remedy be? You've got a disparate impact claim, so you've passed on injunctive relief that would have done anything for your clients back in 2005, and how are you going to designate which ones would have passed in the but-for world? Sure. There is a method to do that, and it's discussed in Bradley v. City of Linn, a case I was involved in. There's something called a shortfall analysis. That is, you can determine statistically that if there had not been a discriminatory exam, if there had been a nondiscriminatory examination, what would likely have been the result to have met the four-fifths rule. And you can then say those are the number of slots, let's say there are five or six, that then get filled by minority, and the law is clear that one is entitled to back pay for a violation of disparate impact discrimination. In addition to that, the court would be warranted if the city of Boston did not agree to this, to issue injunctive relief barring its use in the future, because there's no guarantee now that the city of Boston won't do that, and if you were to affirm the decision of the lower court here, it's likely that they would do it. What do you do about the fact that, as I understand it, the city of Boston brought in a nationally recognized industrial organization expert who's an expert on test validity, and he testified point-blank that this one was minimally valid and was job-related and went on and on about that and why it was and discussed all these things, and the district court heard your experts testify to the contrary and then cited and specifically said it found Dr. Utz's testimony to be more persuasive? That's not what we have the district courts to do, not us. Your Honor, that's not what happened. When you analyze what the court found and what Dr. Utz said, he actually found that the multiple-choice job-knowledge test, rote memory, standing alone, was invalid, not valid. He also found that it did not stand alone, and he accepted Dr. Utz's testimony as to that, and therefore your opening premise strikes me as multiple-choice exams standing alone cause impact as not an accurate reflection of what the record in this case shows. He specifically said, and I'm quoting, I find and conclude based on the evidence as a whole that Dr. Utz's opinion rests on adequate grounds and is therefore correct. But here's the problem with that finding, Your Honor. Dr. Utz found that with the addition of the E&E rating, which, as I'll get into, really accounts for nothing and doesn't drive scores at all and everybody gets the same score, you go from invalidity to minimal validity. Now, that might suffice for using a test as a hurdle, a pass-fail device, as many cities do and as many cases do and as Dr. Utz does in some of his testing and Dr. Silva, another defense expert, does in some of his testing, but they didn't use it as a hurdle, as a pass-fail device, in which case I would have a harder argument. But Utz said he knew they were using it for rank-order testing. The judge said specifically, I have to focus in also on the fact that it was used for rank-order. They both knew it, and he expressed his opinion. With all due respect, that's not what Judge O'Toole said. Judge O'Toole never made a finding, and let me step back, because the test for using something as a rank-order device is substantial validity. That's in the EEOC regulations. It's in the Guardian's case. It's in the Memphis case. All say, and you said in Beecher many years ago, and I'll quote you, even if the test is minimally valid, same language, we might also doubt its use as an absolute cutoff. A test seemingly should receive no more weight in the selection process than its validity warrants. Use of a minimally valid test as an absolute cutoff is questionable, even if more limited uses of the test are acceptable. Now, you said that 40 years ago. Most recently, in Guardian's and in the city of Memphis case, and in the EEOC guidelines, which are competitive to substantial deference, in order to meet muster as a rank-order device, and this is critical to the case, you must be able to show that there are critical elements of the job tested for, substantial and representative, and they're able to differentiate the better candidates within one or two point differences, and none of that is applicable here, and I beg to differ with the court to the extent of suggesting that Judge O'Toole found substantial validity or that their expert found substantial validity. Both the expert and Judge O'Toole found minimal validity and never applied the very heightened standard for using it for a rank-order device. The way it appears they're using minimal validity is that it is valid, although not hugely so, and you could, in theory, have more valid studies. The question is, is it minimally valid, and he says it is. And as I look back at his testimony, he was clearly aware of its use for rank-order. He was aware of it, but he didn't apply the heightened standard. He was aware that it was being used for rank-order device, but he never said it. You say, as a matter of law, this circuit's law is that minimal validity is not enough, that you have to meet a substantial validity test. Is that your argument? Yes, that's absolutely my argument. And that's because of Castro decided 40 years ago. No. Well, I would say... And for circuit law. A more recent law certainly doesn't say that. Well, I don't think there's been a case in this circuit recently that has raised this issue, but I think if you look at the Guardians case, all the cases we cite in our brief, if you look at the Memphis case, which was cited by the Sixth Circuit in 2014, and if you look at the EEOC guidelines, which are entitled to substantial deference, and the Supreme Court says that in the Albemarle case, all of those cases collectively state clearly that you have to have substantial validity to be able to use the test as a rank-order device, because within a few points you have to be able to differentiate who's going to be able to perform the critical attributes necessary for the job. Now, I want to be clear. I don't think the district court was correct in finding that there was even minimal validity, and we think there were clearly erroneous findings with respect to that, but I say you don't get to that question, because it's clear in this record that no one found substantial validity, and that is the law. Now, let me, so when the district court says it specifically found that the selection method reliably predicts a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job, and that he was satisfied that the evidence, including Dr. Upps' testimony, carried the city's burden of showing that, are you telling us that what I just read is not the correct test? That's right, Your Honor. What's incorrect about what I just read? When you read what he's saying, and that's page 36 of his opinion, he starts off by saying that I find, I agree that the test is invalid without the addition of the E&E, which I'd like to get to, because that's very important, but with the addition of the E&E it meets minimal validity. That clearly doesn't meet the standard. He then goes on to quote some of the science, the testimony in the case, that he is satisfied that people who perform generally better on a job knowledge test, generally do better on the job. There was testimony. Now, there was also testimony that people who perform better on structured oral interviews generally do better on the job. People who do better in assessment centers generally. There's some statistical relationship between the two. But that's all he's saying in the sentence. He doesn't go on to say, now I go on to assess whether under the EEOC guidelines and under the Second Circuit, Seventh Circuit decision, there was substantial validity, meaning between just several point differences you can differentiate who the better candidates are. And this is why he couldn't say this. Their expert in the case, Dr. Jacobs's firm, recommended that the scores be banded in seven or eight point bands. And in his letter recommending banding, and the department tried to implement banding, he specifically says that you can't differentiate the better candidates between small point bands. And he recommended like a nine or ten point band. Everybody within that band would get the same grade. But there's even a more important reason. It's not just substantial validity that you need to have rank order. Under the EEOC guidelines, in the City of Memphis case and all of the other cases, you also have something which is variability. You have to have test scores which are so varied on the important aspects that you can tell between the better candidates. Well, here's the rub. When you look at the EEOC, the experience rating, there is no variability. If you look at the experience. I'm sorry. I'd like to go back and follow up with Judge Keada. Can I make this one point? Because I think it's critical to this issue. With respect to education and experience, if you look at the test results from 2005 and 2008 and 2002, for the education and experience, everyone, from the people who have a master's degree to the person who has no degree, gets either a 16, 17, or 18 on a hundred point scale. Only 20 points, as you know, relates to the E&E. But because you get 70 points just to sit for the E&E, which is really just filling out a form, and because you get several points in addition to that for just having enough time on the job to be there, there's only a very small differential. Now, nobody has a PhD, so nobody gets a hundred points. And most people have an associate's or college degree because of the Quinn Bill. Most police officers have an associate's or college degree. So when you actually look at the data, the scores are all mashed together at either 16, 17, or 18. There's absolutely no variability. In fact, I think 200 people all had 17s. 150 had 18s. So here's the court saying that the thing that takes this over the goalpost for the defendant is the E&E rating. And this goal, this thing that, therefore, you can differentiate to meet the higher standard of rank order validity, in fact, has no variability. Yet variability is one of the three things you must have under the city of Memphis guardians and EEOC guidelines. There was some dispute about the numbers, and some of the experts were saying there was a six-point maximum range on the E&E portion as a practical matter. There is a theoretical six-point range. That is, if you've taught five college-level courses and had a Ph.D. But if you brought down the actual distribution curve and you take off the end points, you're getting down around three. But it's also the case for the other portion of the test. If you did that same analysis, you get down to about 40 to 50, not 100 points or not 80 points. Well, that's true. But at least you could argue there's variability there. The problem is it's all rote memory. It doesn't test for supervisory ability. It's all rote memorization. So what you're saying is that the E&E impact in terms of the ultimate outcome was quite small, even as a potential matter, but certainly as an actual matter. But you then want us to find that it was so small that it was essentially irrational to say that it could provide the little extra oomph to get the exam over into validity, as Dr. Utsa testified. And the judge believed Dr. Utsa, so we're kind of stuck with that. Well, but you're not for the following reason. The court made no such finding and neither did Dr. Utsa. Dr. Utsa testified in his testimony. He agreed that at best the E&E accounted for maybe two points. That's in his testimony. I can cite that to you. The court never did that analysis, and that's part of my problem with the whole court's decision. This very important question of variability, he just punted because I don't think he ever, when you read his decision fairly, I don't think he ever addressed the question of rank order validity. He simply said, and this was one of the questions he asked me in closing, well, isn't it like being a little bit pregnant? It's either valid or it's not, and if it's minimally valid, you lose. But that actually is not the law. Minimally valid can only be used for certain qualifying purposes at best. It can't be used for rank order purposes, especially when rank order was used here, and it's very critical in this case because the cities use rank order right down the line. And I think that is one reason, as a matter of law, they lose the case. Again, to go back, the district court expressly said that Boston must show that a higher score is likely to result in better job performance. He quotes the law, and then he says, based on the testimony in front of him, Boston has satisfied this test. Are you – I mean, that is the way I read this. Are you telling me that that is wrong? Yes. It's wrong as – Because there are no subsidies. No, wait a minute. Sorry. It's a different argument that nothing supports that finding than the argument that the finding wasn't made. Which are you arguing? Both. He did not make that finding. I submit to you that that one sentence out of 40 pages that says that I am satisfied that generally a candidate's suitability for the job, such that persons who perform better on the test method are likely to perform better on the job, when you read that in context, he's talking about the metadata that simply shows that people who do job knowledge tests, there's a relationship between that and their job performance. That's not in any way an indication that the stringent EEOC and federal court guidelines for rank ordering were ever used. But he – well, how can you say that? I'm just flabbergasted because he says the use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance, and then he specifically cites section 160714C9, which you now want us to find that he ignored. But he never comes back to it. He never comes back to it except for that one sentence. He doesn't come back to virtually everything in his opinion, not any opinion. You say it once, and then you – it sounds like what you're saying, okay? It sounds like what you're saying is that by properly stating the law and then saying he found Utz's ultimate conclusion correct, and then that unless he repeats everything in Utz's testimony, then it sounds like your argument to us is that we get to supplant the district court's fact-finding and I guess our opinion would then have to repeat everything that Utz says. I don't see why it works that way. When you're dealing with this issue, first of all, he never deals with the issue of variability at all. There's not one sentence in his decision as to variability, although we pressed that at trial, we cross-examined Dr. Utz and others. Exactly. And he found he didn't – you know, I thought you did a pretty good examination of Dr. Utz, but the court, who was the fact-finder, wasn't so impressed. But he found nothing on variability, and variability is one of the three requirements to have rank ordering. You have to find variability. He did not find that in the E&E or in the multiple-choice test. That's number one. Secondly, I really don't think – again, when you read his decision, fairly stated, he never goes and says, okay, these are the higher standards that I have to meet. You have to show significant differentiation. The candidates will perform better, and there has to be a more representative sample of the job, knowledge, skills, and abilities that's different from what you need for simply minimal validity for qualifying exams. He never found that it added any of these skills and abilities. In fact, when you look at the test outline and you look at the KSAs, there were 200 KSAs that were found to be important for the job. They agreed, the defendants, that they couldn't test for most of them because those were skills and abilities that you couldn't test for on a written exam. All they did was test for the knowledges. But to justify rank ordering, you have to test for a representative, a higher level of skills and abilities, critical skills and ability, that differentiate one's ability to do the job. The judge made no such findings. None of those findings are made. One sentence, which is elliptical at best, cannot suffice. Let me just point out you're using up time that you saved before. Excuse me? You're using up some of your time that you saved for rebuttal. Yes. That's all right with me, but I just want you to be aware. Well, the last thing, let me just finish with this. I'll rest on my brief. I think there are numerous ways in which the test itself, the multiple choice test, is invalid. Just to leave you with one of those. There were subject matter experts who were asked to rank the various tasks, skills, and abilities necessary for the job, and they were asked to do that. Eleven different SMUs were asked to do that, and they were asked multiple questions, like 20 questions for each task, skill, and ability. How much do you do it? How important is it? As we pointed out, every subject matter expert in every question allegedly agreed on every answer. So there were 20,000 answers, and every one was the same. That tainted the way the exam was put together in such a way that it can't possibly be upheld when you have this critical aspect that's impossible to defend. The final thing I want to say is with respect to less discriminatory alternatives, I just want to be clear that the court made three fundamental legal errors that require reversal because we can still win, even if the judge was right on everything he said, we can still win if there were less discriminatory alternatives. He made three critical errors of law. Number one, he found that you couldn't have a performance review system that is known to be less discriminatory because it would violate the collective bargaining agreement. Title VII clearly preempts that. Number two, he found that you couldn't have... Banding and inconsistency with state law. Consistency with state law, yes. The banding, he found the banding could not be used even though the defendant's experts recommended it, and that's clearly violative of Title VII because Title VII trumps. And finally... Wasn't there a superior court injunction against using it? The superior court only said... First of all, federal law would still trump, but the superior court didn't say you couldn't use it. It said you had to go through rulemaking before you do it. Yeah, you couldn't use it then and there because you hadn't followed the proper procedures. Yes, but the test was months away at the time. They could have gone through the proper procedure or appeals, and they didn't. They chose to bow to what the unions wanted, and they didn't do that. And the final thing is that the court's primary reason for saying that there are no less discriminatory alternatives in the face of all the evidence showing that there are was that he looked at the 2002 experience and he said, well, that didn't really result in that much less adverse impact, therefore it would be futile anyway. But we pointed out to you two cases, City of Memphis, a 2014 case which relies on Allen v. City of Chicago, and both of those cases say in the complete converse that you can't rely anecdotally on one test result in the past to say there are no less discriminatory alternatives. And therefore, for those three legal reasons, not factual reasons, there was legal error in that determination. Thank you very much. Thank you. Mr. Charger. Good afternoon. May I please the court? In each of the four years at issue in this case, looking at the statewide test, there were dramatic and highly statistically significant differences in the average scores of black and Hispanic police officers on the one hand and white officers on the other. Those average score differences range from about three and a half to five points. The significance in this context, as you just were talking about with the rank ordering device, is profound. Every point makes a difference. The likelihood that these score differences occurred by chance is less than 1 in 10 million for three of the years in question and less than 1 in 100 for the fourth year. There also are statistically significant differences statewide in passing rates. If you look at Boston, which has conceded disparate impact but is still relevant here because it's next to the statewide data, that's the largest jurisdiction and that provides the most powerful analysis of the underlying nature of this test. Again, there was dramatic and highly statistically significant differences in terms of average scores between black and Hispanic police officers and white police officers. There were significant differences in terms of passing rates and there were significant differences in terms of promotions. Just to put some real numbers here, if you look at the city of Boston, out of 213 black and Hispanic police officers who took the 2008 exam, one was promoted. There were a slightly larger number of white police officers who took the 2008 exam. 25 were promoted. Virtually every other measure in this case, whether you look statewide, Boston, or within the smaller jurisdictions, some of those measures were statistically significant, some of them were not. But virtually every single one pointed in the same direction, which is that black and Hispanic police officers fared worse under these exams. And of course, nobody should be surprised by that because as all four experts testified in this case and as this court recognized in the Beecher case 40 years ago, the same one that Mr. Lipton was talking about, it's known and has been known for decades across the country that black and Hispanic test takers, for whatever reason, we don't know why, perform predictably worse on these types of tests. Is there a disparate treatment case claim in this case? I don't think there is. There's not, Your Honor. So there's no claim that the city of Boston picked this test in order to achieve an improper result? That's correct, Your Honor. And I take it, in fact, the record is, ironically, they came to these tests to try to avoid the type of subjective who-knows-who decision-making in the past that were badges of discrimination. That's correct, Your Honor. That's one of the rationales. And so now we're to the point that they use a test that they admit has an impact and so that imposes an obligation on them to prove validity. That's right, Your Honor. They're not debating impact, so we're talking about validity and whether there's an alternative that would have less of an impact. Well, the other six defendants in this case, Your Honor, are all contesting adverse impact. So with respect to those- But not based on those numbers. If they're basing it, the others are basing it on the statistics. They're simply saying you can't aggregate each of the jurisdictions across geography and across time. Right. Well, there's a couple of different arguments that they're making. So you're going to address those arguments? I am. So with respect to some of the jurisdictions, there were statistically significant findings within the jurisdiction. So for Lawrence, Lowell, and Springfield, for example, there were statistically significant differences in the average scores of black and Hispanic candidates on the one hand and white candidates on the other. But more than that, so if you look at aggregation, Judge O'Toole rejected statewide aggregation, and I think there were legal and factual problems with that rejection. The factual problem with it is that the experts in this case agreed that it was appropriate to look at statewide measures of average scores. Originally, their experts said aggregation you can't look at, but then on cross-examination, he distinguished between aggregation over time, which he found problematic because you might be testing some of the same people. There's a lack of independence. But if you look at one test, the same test given across the state, to look at average scores to understand if it provides a fair opportunity for black and Hispanic candidates on the one hand and whites on the other, that's appropriate. So the expert, including the defendants expert, agreed that was appropriate. As a legal matter, this court recently in Jones last year, as you may recall, the plaintiffs in that case relied on aggregated data. The city of Boston not surprisingly objected to that. But this court rejected the city of Boston's argument because there was no evidence to support their critique of aggregation. You can't just posit a hypothetical problem with aggregation without backing it up with some evidence. And you'll see that Judge O'Toole cited no evidence to undermine aggregation here. He posited that there might be differences in terms of training. So you're saying aggregation sometimes is wrong, sometimes it's right, so we don't know which it is. And the burden, citing Jones, would be that if someone is going to dispute aggregation, they need to show the type of confounding factors of presence that would make the aggregation mistake. And you're saying the defendants didn't do that, they just pointed to the theoretical problem. That's correct. There was no evidence in the record, and we know that with confidence because you have seven briefs from the other side that surely would have pointed to specific evidence of a problem with aggregation. And the theoretical problems that Judge O'Toole highlighted were maybe there's different training across jurisdictions or maybe there's different initial hiring standards. Well, that may be. Those are theoretical problems. But if you look at what this court did in Jones and the Ninth Circuit did a similar analysis in Page v. California, when you have spatially probative evidence and looking at statewide evidence of how an exam is administered and how everybody scores is spatially probative, if you're going to challenge that, you have to have some basis in evidence for challenging it. Can you put this logically in context? If we were to reverse Judge O'Toole's findings on either validity or alternative, then we would necessarily have to also address the aggregation issue as far as the other communities following it correctly. I would say yes. If we were to find that Judge O'Toole engaged in fact-finding that was with no legal error on validity and alternative, would we still need to address the aggregation issue? No, because we need to win on either prong. We need to win on either one of those, and then we get to aggregation. Well, formally, aggregation comes first. So the first step is whether we make a primifacia case of adverse impact. But that standing alone doesn't win us the case. We have to also win prong two or prong three. I think another, besides simply the aggregation, another problem with what Judge O'Toole did here is he imposed a very specific, narrow requirement on the plaintiffs with respect to the smaller jurisdictions, which is that you have to show for each year, for each jurisdiction, just confining your analysis to that one set of data, that there was a statistically significant difference in terms of promotion rates. Now, we all know as a matter of basic statistics science that you're not going to be able to do that with smaller jurisdictions. But more fundamentally, this court and the Supreme Court have never suggested any such narrow requirement. And if you go back to the Beecher case back in the 70s, or even the City of Fudge case, I'm sorry, the Fudge versus City of Providence case, which you will hear, I'm sure, from the defendants about, what happened in that case is this court said that there was one year's test. The disparity there was not statistically significant. And so, therefore, the plaintiffs did not prove their case. But what's really significant about that case is you can read in the court's opinion that it was almost a lament that the plaintiffs in that case pointed to no other evidence. And the court, just to point out here, that after the court said you need statistically significant evidence if you're going to be reliant on numbers, went on to say, if the probability is sufficiently high that the disparity resulted from chance, in other words, if there's no statistical significance, the plaintiff must present additional evidence of a disproportionate impact. And so that's what we did here is there was mountains of other evidence besides that small, narrow type of evidence that Judge O'Toole was requesting here, requiring to show that there was adverse impact. And to illustrate in such, now Justice Breyer, then Judge Breyer, in a concurring opinion, noted this court has held that where samples are small, as is true with smaller jurisdictions here, other evidence of disparate impact may be highly relevant. And he then cites the Beecher case. And the parenthetical he has there is that in that case, in Beecher, all of the experts who testified testified that these types of tests are known to have a disparate impact, which is precisely the same evidence we have in this case. And for whatever reason, in the Fudge case, the plaintiff didn't introduce that evidence. And Judge Breyer was saying there, that's an easy showing to make, but the plaintiffs didn't make it here. He then went on to say, nor is there any evidence that blacks taking the 1974 test had a lower mean score than whites. And, again, we have that type of evidence over and over again in this case. So the courts have consistently, this court has consistently recognized that there are a number of ways to prove adverse impact. You don't need to have one specific type of statistically significant showing. The final point I wanted to make is you will hear from the defendants that this court should apply a clearly erroneous standard with respect to adverse impact. And, obviously, there's a strategic value to them in having to use that type of standard. But for purposes of adverse impact, there was no disputed evidence. The numbers are the numbers. There's no dispute between the statisticians about what the numbers were or what was statistically significant. The only issue is what is the legal significance of all those different numbers. There's no credibility determinations here. All the experts agree that it's appropriate to look at average score differences, which makes sense. Well, do your numbers work in terms of getting to at least two standard deviations if we rely solely on geographical aggregation? Or do we also need- Oh, no, absolutely. Okay, so if you look just at geographical aggregation statewide, the standard deviations would be out of the park. Because the P value, which is similar, was one out of ten. The chances that those results occurred by chance were less than one out of ten million. So I don't know the standard deviation, but it was probably like 50. It was way, way, way over two or three. And that's what's so clearly wrong here is that we have this evidence everybody could see, and we knew even before the tests were administered that we were going to get this kind of outcome. But we then got the results, and the results showed, beyond any possible question, that they posed more of a hurdle for black and Hispanic test takers, which is precisely the analysis that's supposed to happen at the first stage. The irony of the nonintuitive aspect of this is you could have a town that gave this test, promoted only a minority person, no whites, and find that they broke the law. Well, you wouldn't bring that case because- Well, no, because you had other minority applicants who want to be higher on the list or something like that. Well, I think even- Well, suppose you had three and one. There would have to be harm. Right. If you had three minorities get promoted and one majority in that town, there would be a claim for the non-promoted minorities. Not if they were all promoted at the same time. But if that one white officer- if the promotion of that one white officer meant that there was a black or Hispanic officer who wasn't promoted, then the evidence here suggests there was an adverse impact, and then the question becomes validity and less discrimination. It could have just been a bunching, and there should have been four for fours. I have a question. Yes, sure. It isn't these defendants who write the exam. And last time this case was here, we found that the congressional definition did not reach the actual people who write the exam. Congress, for some odd reason, chose to make the writers of the exam and states with civil service systems not liable under that statute. Now, this has been clear for some years. If you're really concerned about disparate impact, has anyone been back to Congress to suggest that the way of approaching the problem is to make the state writer of the exams liable? That's an excellent point, Your Honor. I don't know the answer to that question. We do have a separate case against HRD under different theories in the state court. But in terms of whether- The state court accepted the same theory we accepted, that there are not supervisors. It's a different theory, Your Honor. It went up to the SJC, and they have approved the theories that we're now pursuing against HRD. That case is currently state pending a decision in this case. And is that case going to be pursued if there is an affirmance in this case? Well, I think that they-I don't know the answer to that question, Your Honor. I think one of the requirements, at least for one of the theories, is that there was underlying discrimination. So in terms of that theory, I don't know that we would. But I can't answer that question in full, Your Honor. I don't know. Okay. And then on the Supreme Court's most recent pronouncement, it seemed to be a sort of shying away from the theory of disparate impact. Do you consider that to be limited to the housing area, or does that case have any impact on this one? I don't think it has any impact on this, Your Honor. It's a different context. Because it's a different context? Yes. Okay. Thank you. Thank you. Thank you. Ms. Robin, good afternoon. May it please the Court, my name is Bonnie Robin Vergeer, and I'm here on behalf of the United States as amicus curiae in support of the plaintiff's appellants. What we have here is a written job knowledge test that the defense expert testified and the district court agreed was not valid on its face on its own, coupled with an education and experience in any component that was never linked to the knowledge of skills and abilities the KSAs attributed to it. But the expert says it was representative of important skills. That's specifically what Dr. Utsa said. What Dr. Utsa said was he took a numerical view, and this is the view that the district court took of how you analyze representativeness, and this analysis was wrong legally. But what he said was that you look at the boxes. The testability analysis we appended to our brief that was part of the 1991 validation study, it's got three columns. It's got written tests, it's got E&E, and it's got not tested. And this is aspirational. This was a feasibility analysis. And what Dr. Utsa said is you count the boxes. The E&E's got 24 boxes, and the written test has got 60 boxes. That's 84. 84 is a majority and more than half of 156, so it's representative. That is not the correct analysis. Well, he said much more than that, though. He also pointed out that when the test was first introduced, incumbent sergeants scored far higher on the test than people who weren't incumbent sergeants, 63%, which to him he saw as direct evidence of job-relatedness. But it's not. What that's direct evidence of is the fact that the same people are good at taking a rote memory test the first time are good at taking it the second time. Well, but it isn't. This was the first time that test was used. This was 2005, and so the same test wasn't used before that. What I keep hearing here is in the government's brief read like this, it was an attack on Dr. Utsa's testimony and basically saying that it was wrong as a matter of industrial organizational theory. And I don't know if that's – I'm not an expert on that, but that's why we have experts. There was no Dalbert challenge that is now on appeal, and the judge was persuaded by it. So why is the Justice Department telling us that we should replace Judge O'Toole as a fact-finder in terms of which expert he picked? Ultimately, it's the district court's job to apply the law and to make a call on whether the legal standards have been met. I mean, it's not something that can be punted to the expert. Right, but then I look at your brief and I don't see a line in your brief where you point to any statement by Judge O'Toole regarding the law that you say is inaccurate. It looks like he nailed the law on the head in terms of his lengthy recitation of the principles and everything. And so the first thing I looked for in your brief was, was there anything Judge O'Toole said about the law that you think is an incorrect statement of the law? And maybe I missed something, in which case you should direct me to what he said. It's more the application of the standards. But the actual standard for representativeness is not counting boxes. Ultimately, there's a qualitative component, which requires that the exam tests for the most important and distinguishing KSAs needed for the job. And here you have rote memory multiple choice tests that did not test for supervisory ability. But that's what you say, but Dr. Utsa disagrees with you and he has a lot more credentials than you do. But Dr. Utsa did not testify that the written exam tested or even the E&E tested for supervisory ability. What he said was that if you count up the number of boxes, you get to more than half of 156, and this is relying on the KSAs in the 1901 feasibility analysis, which is attached to our brief. Now Boston argues that the multiple choice test does test for supervisory ability, but it actually just tests for knowledges. And even the 1991 validation report says that the subject matter experts believe the written test didn't test for the ability to supervise and manage, and that most of the tests examined for rote memory. And that's at the record appendix at page 3785. So the district court agreed with the expert that the written test alone was not valid and only found minimal validity for the test as a whole because of the E&E component. Dr. Utsa testified that the E&E component was sufficiently linked or related to the job because a questionnaire was given to the subject matter experts. And if you look at that questionnaire, which is attachment W to the 1991 validation report, and that's at record appendix 3726 to 3730, what that attachment W asks is the subject matter experts to rate the usefulness of different degrees and work experience. Like how useful is it to have a Ph.D. in business management or to have an associate's degree in business management? And that general kind of is it related, is it useful, is not the analysis that the guidelines and that case law requires be done in order to validate a training and experience component. You have a lot of tests where you have like a training experience component. It gives you a couple points for seniority, but they're actually relying on this component to push the written test over the top in terms of representativeness. And I just want to read to you or quote you what the guidelines say about training or experience elements. The critical consideration is the resemblance between the specific behaviors, products, knowledges, skills, or abilities in the experience of training and the specific behaviors, products, knowledges, skills, or abilities required on the job. That's from 29 CFR 1607.14C6. There wasn't that analysis that was done. And Dr. Utz didn't testify that that analysis was done. So you have this testability analysis, which is test or brief, which supposedly has 24 KSAs that are attributed to the E&E. No one ever went back and said, well, gee, what does this rating sheet, we're just still in lost circles about what degrees you have or what training. How does it actually show that you have supervisory ability or decision-making ability or interpersonal skills or oral communication skills? That analysis simply wasn't done. You just have this questionnaire. Let me, maybe we have, my notes of Dr. Utz's testimony says he specifically testified that the exam tests enough supervisory schools to be valid under the uniform guidelines. He also referred back to the studies done in 1991. I mean, this is the guy the government hires sometimes as its expert to do stuff. It sounds like you're now arguing with him that he's wrong, and you're saying it didn't test enough supervisory skills. You may be right, but why do we do that back finding? But Dr. Utz didn't say, I mean, I read his testimony. I don't read Dr. Utz to say that the E&E, I mean. It's 1971, exam tests enough supervisory skills to be valid. So, do we accept that as legitimate back finding, or are you telling us that as a matter of law he couldn't say that? Dr. Utz agreed that the written test was insufficient standing alone, and so it seems like ultimately putting all this weight on this one rating sheet. Well, no, he didn't do that. He didn't say the written test was zero. He said it was not enough. Cross-examination didn't establish if he thought it was 81% or 99.99% enough, but he then said that if you add on this additional bit, that's enough to push it over. Right, and that's why we're focusing on that, because the district court agreed that supervisor ability, interpersonal skills, decision-making skills, that had to come from the E&E. You just have to look at what this is. I mean, for example. I think everybody agrees it didn't add a lot. It had quite a narrow range because most of the points everybody got. So you established below that it didn't add a lot. Where do we find that it was clearly erroneous or unlawful for it to find that the little that it did add was not enough? There's no determination or any focus that I've seen where on the E&E you get tested, or it basically would be used as a proxy, I guess. It sounds like you're saying plaintiff's counsel should have moved under Galbert to strike the expert testimony. I'm afraid I have to agree with that. You seem to be arguing that one of the country's leading experts didn't know what he was doing, and therefore when he drew conclusions, he had no basis for the conclusions, and the district court could not rely on his analysis. What I'm saying is that if you actually look at the E&E component, it hasn't been validated according to the standards for validating components of a test for content validity. But he said it has. Okay, and he's an expert who was not subject to a Galbert test, who testified in front of Judge Raffullo, and Judge Raffullo found him more credible than the other expert who said what you're saying. We get that all the time, and we say that's not what a court of appeals is for. Right. Ultimately, the determination of representativeness and whether or not the court applied the right analysis, and basically looking at the number of boxes that were checked, versus evaluating whether the most important and distinguishing features of being a police sergeant were actually measured by the test. That's the job for the district court. We don't think the district court did that job. But I'd like to move to the rank ordering point, because I think it's critical here. As Plaintiff's counsel has already testified, or not testified, excuse me, as they've argued, a test can be valid for one purpose, but not be valid for the purpose to which it's actually used. This court said that in Beecher, but it's also recognized in the guidelines, which require that the operational use to which a test is put is required. A showing has to be made that it is content valid for that purpose. Here, you need substantial test validity, and that's incompatible with the district court's finding of minimal validity. And the banding point is quite important for purposes of this validity analysis, because the test developer, HRD, attempted to implement banding for the 2008 exam with seven-point bands. That fact is incompatible with the requirement. But let substantial validity be shown that you can differentiate scores by one point, which is what rank ordering does. The test developer conceded that candidates were equivalent within seven-point bands. So that is directly at odds for purposes of the validity analysis, with the determination that has to be made. And this is the Guardian standard, but it's the prevailing standard that you need A substantial test validity that it's reasonable to expect one- or two-point differences in scores to reflect differences in job performance. To help me with this one, Judge O'Toole said, and I'm quoting, the use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance. Was that an accurate or inaccurate statement of the law? It's accurate, but I think it doesn't... You don't think he applied it? I don't actually think that the sentence that was being discussed before is an attempt to apply it. But even if that sentence was what the judge intended to be addressing rank ordering, I don't think it's sufficient because it doesn't meet the substantial validity requirement. Minimal validity is incompatible with it, and the uncontested effort by the test developer to band the scores within seven-point ranges is directly inconsistent with them being differentiated one point. And the judge did not address banding in the context of validity. He discussed it only in the context of prong three, whether or not banding was available. But I think it's directly significant for purposes of the validity analysis. We obviously addressed the prima facie case as well. I'm not by a time stamp, so thank you. We're going to take a brief break. My name is Kay Hodge, and I represent the city of Boston. And I just wanted to just go over very briefly sort of the big picture of the facts, and that is that Boston conceded much of the statistical adverse impact of the 2005 and 2008 tests, and that, therefore, the issue moves on to whether the exam was job-related and consistent with business necessity for purposes of rank order selection, which I will refer to in prong two. Before you get going, I understood the plaintiffs to be arguing that minimal validity is not enough, that a more substantial validity is required under our case law in Castro versus Beecher, and that the district court findings on validity had failed as a matter of law because they did not reach this higher standard. So I do think the question of the impact of the exam and the degree of validity is the first thing that you should be addressing. Thank you, Your Honor. I will in just a moment. I was just going to say that I refer to that as sort of the prong two issue, and then, as you know, there is a prong three, and that is whether or not the plaintiffs have, in fact, identified an equally valid selection device that meets Boston's needs and has less adverse impact, and that Boston knew about it and or was offered it by the plaintiffs, and it was, therefore, rejected. Now, I apologize. I've got a horrible cold, so I'm just trying to hear and talk at the same time. In any event, the big picture question that you're asking on minimal validity versus substantial validity is, quite frankly, in my opinion, a semantic one, and I think Judge Chiara raised some of that in your questions, and I think that what you have is the following situation. If you'll bear with me for just a moment, I'd like to just come back and return to that in just a moment. When I talk a little bit, I'd just like to contextualize what we're dealing with here. We're dealing with the selection of superior officers for the Boston police, and I want to be clear that Boston shares the frustration reflected in the plaintiff's claims that various testing methods to date have not been able to reliably reduce adverse impact on black African-Americans and Hispanics. However, we have a process, and that process is the process of disparate impact, and the question really is, and I was listening intently to the plaintiff's presentation and to the government's presentation, and it sounds like there is a silver bullet out there that will, in fact, eliminate disparate impact. I will be clear, if there is that silver bullet, Boston's willing to certainly take it into consideration, but there isn't. And what you read now in all the cases, and the case decided by the First Circuit, was one of the very first out of the box a long time ago, and I don't mean to date it, and I don't mean to otherwise suggest that it's not as vibrant as it used to be, but what we now know, and what we do know, is that cities like Boston have an interest, and it is a public safety, it is a very serious public interest, in having police officers on the street and having them supervised by superior officers. And it is that interest, and if we don't have an exam, and to some extent, this whole exercise, and if you watch the law through all the various cases, and I know the plaintiff keeps turning you to Johnson, most of the, there are few cases that are now finding that the testing methodology is no longer valid or usable in these kinds of circumstances. And what I'd like to do is I want to make it clear that while Boston agrees that it would like to see more minority superior officers, the fact of the matter is we can't select them by race and national origin. And I just want to pick up for just a moment on banding, because I'm just a labor and employment lawyer, I deal with practicality, and the practicality, let's talk about banding. Okay, so now you have a band that covers eight different scores. How do you differentiate within the 30 or 40 people in that band in making your selection? Race? The law does not allow us to do it that way. I suppose you put all the names in a hat and you pull it out, but that really is not a merit-based system that we're required to have under Chapter 31 of the National General Laws or Civil Service System. And so consequently, it is important to understand that... Let me stay with that last point, because I'm not sure I followed it. If you accept the proposition that a difference of one, two, or three points is literally immaterial, signifies nothing in terms of greater probability of good performance or bad. So a band, therefore, goes to a band, you lose no information. Why would it then be irrational to randomly pick out of the band? That wouldn't be the validity of the score. Well, Your Honor, I think that if you really look at the evaluation, and we haven't been presented, clearly the issue of banding that was suggested by Mr. Jacobs in the exhibit that you have in front of you in the record appendix does not go into any great detail, and as you know, we never got there because of various and sundry legal challenges. But the fact of the matter is, there is, and I would just direct your attention to, and I must confess I may not have the record site, but we cite in our brief that the plaintiff's exhibit, Dr. Wiesen, testified that multiple choice tests on job knowledge may be the most valid test, very close to the most valid predictors of future job performance. There is similar testimony by Dr. Utz. And there is, I mean, now that I've gotten quite immersed in this area, it's considered by some to be the gold standard. Dr. Utz made plain as he could be that he thinks he could have done a more valid test than this one. He would have had a higher correlation. Well, the question then is, Your Honor, there's nothing in the law that says you have to have the most valid test, and it doesn't say that you get points for higher validity. What we're looking at is whether or not it has a direct impact on less discriminatory impact, less adverse impact. And what we're seeing throughout the country is that even though you add all these extra components, including components that Dr. Utz is recommending to tests, it still does not affect adverse impact. What do you propose? Do you propose any particular legal test for what degree of validity gets you over prong one? Is it anything? Once you move off a random correlation, have you accomplished prong one? Prong two, I think. Prong two. I'm sorry. And if not, what test do we use? There's this talk, which I find very unhelpful, substantial and minimal. I don't know what those mean. Is there any other way? I don't know what those mean either. But also the point is, like I said, the end result is not having the perfect test. The end result is having a selection device that helps us to select better police officers. But features suggest it's got to be more than just a teensy little bit. Well, but the point is, is that we have testimony certainly in this case that is supportive of the idea that if you have a content ballot, paper and pencil test, that that is appropriate. And I would just, I'd like to just move a little bit just to the, how do we resolve this? I think the Supreme Court gave us a methodology for resolving this. And quite frankly, it is not along the lines of the plaintiffs. And in particular, I'd like to pick up on what Mr. Churchill said, that the most recent decision of the Supreme Court in June of 2015, the Texas Department of Housing and Community Affairs and Inclusive Communities Project case, has no applicability here. And I start initially with Ritchie v. Cessna. Decided in 2009. The core issue in that case was whether or not whites have any rights. It was brought by white plaintiffs. And the court clearly made it clear that unfortunately in this testing arena, everyone has a right. And we must balance and we must be fair, quote, unquote, fair and equitable to everybody. In that particular case, the city of New Haven and the minority plaintiffs and minority firefighters who were disappointed in the results of the exam, and it was, by the way, an exam with an additional component. It was not just a knowledge-based test, but they also had an oral component, did not yield as many minorities as the test givers in New Haven wished to have them yield. But what the Supreme Court did in looking at prong two, and they very clearly held or opined on the prong two issue that this valid, content valid test could be used for rank ordering. And the distinctions, again, in that case were not significant. And what is most important or most interesting about it is if you read the dissent penned by And it goes to the issue of a substantially valid test or perhaps not so valid test. Many of the issues raised by the plaintiffs in this case were raised by Judge Ginsburg in her dissenting opinion in Ricci. And I think that that becomes important to understand that all of those issues were at least And what's also important in Ricci is the fact that the court actually said, and I go and I speak to a number of the cases here in the First Circuit dealing with race and promotions and selections. We conclude that race-based action like the cities in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate impact statute. And what is interesting in that case is if you will test this, quote, minimally valid, the question is does that give you the, quote, strong basis, substantial basis that the Supreme Court was talking about that allows you to disregard the test or to make other alternative determinations about how you're going to treat the test. Now, taking Ricci for a moment, and I understand that both the plaintiffs and the government argue Ricci has nothing to do with this case. I think Ricci very clearly explicated what the burdens of proof are. But in Texas Department of Housing and Community Affairs versus Inclusive Communities Project, it was a narrow issue before the Supreme Court, and the narrow issue was whether or not disparate impact cases were cognizable under the Fair Housing Act. Many people thought the disparate impact was dead after Ricci. The fact of the matter is that it still is life, and the Supreme Court found that disparate impact applies in fair housing cases. But what's most important for our purposes here is they affirmed repeatedly aspects of the Ricci decision that go to burdens of proof. And they expounded, and it is not essential to the decision, but they expound on what one should do when one is faced with some of the problems we have, I think, in this case. And the court incites Ricci and states, disparate impact liability must be limited so that employers and other regulated entities are able to make the practical business choices and profit-related decisions and sustain a vibrant and dynamic free enterprise system. And before rejecting a business justification, or in the case of a governmental entity, an analogous public interest, a court must determine that a plaintiff has shown that there is an available alternative practice that has less disparate impact and serves the entity's legitimate needs. Now, why do I think this is important? Because what the Supreme Court is really saying is you've got to look at prong two and three almost together. Because if you say to a city like Boston, sorry, that test isn't good enough, then what? We don't have superior officers? We don't choose anyone? Obviously, that's not a good answer. So you have to look to prong three. And I challenge the plaintiffs. And, indeed, Judge O'Toole decided that they had completely failed to prove prong three, an equally valid, less discriminatory alternative that was, in fact, offered to the city or the city knew about, and it rejected. And I would point out that the city had, in 1992 and in 2002, had, in fact, used a multiple-component test. Read many of the cases. Johnson. Read Boris. There are a litany of cases cited in our brief where multiple-choice tests were given and found valid and, in other instances, were found to be supported and content valid enough to support rank ordering. Because that is the interest of the city. And, remember, the audience isn't just, oh, well, we'll pick it out of a hat. The fact is that we have an audience, which includes all those who took the test, who studied very hard, and to say to them, I'm sorry, the fact that you got a much better score by eight points than somebody else isn't meaningful, is, unfortunately, something that's very hard to deliver. And I'm not sure that we have to, as a matter of law, do so. I will rest. We will rest on our brief. But remind the court, and I use this in the terms of my colleague who was previously here this morning. I think the judge said your time is up. Yes, that we believe that the error here must be clear, and we don't believe in the Equality Eroneous Standard that you should overturn the decision of Judge O'Toole. Thank you. Thank you very much. Mr. Kavanaugh. Good afternoon. May it please the Court. My name is James Kavanaugh. I am here representing the MBTA, and I'm also here to make the disparate impact argument with respect to the smaller jurisdictions in part, although two of them I'm going to argue as well. I'd like to first, if I might, address the point made by Plaintiff's Counsel on aggregation and whether or not the clear error standard applies to that or not. And I suggest to you that their position is incorrect, that much of the time at this trial was dealt with expert testimony dealing with aggregation from two experts of the plaintiff, two experts from the defense side, and Judge O'Toole relied upon their opinions, made credibility determinations based on their opinions, and that was the basis, as he said in his opinion, for the judgment that he made about aggregation. But listen, I thought the argument was a little bit different. I thought the argument was that all the experts agreed that if you just looked at the numbers and combined them, you got a very substantial impact. So the proposition was put forward that aggregating may introduce compounding variables that could account for the differences, so it's improper to aggregate. And then the question is, who has the burden of showing either the presence or absence of the compounding variables? And as I understand the argument, the argument was that the judge in effect placed the burden on the plaintiffs to disprove that there were variations among the towns that would make aggregation inappropriate, and that's what they say is the legal failure here. So it would be helpful if at some point you address who has to frame the hypothesis and even negate or prove that there may be differences between the towns that would make geographical aggregation inappropriate, when you get such a big number at the outset in the aggregated form. Your Honor, it's the opposition that it's the plaintiffs that have to prove. They have to prove disparate impacts, and one of the waystations along their proof that they've adopted is aggregation. But do they have to prove that the weather was different in the different towns, it was really rainy in a couple of towns, and that might have impacted one community more than the other? Or would you have to suggest that that was the case and then it be disproved? I think, Your Honor, that based upon the testimony of the two experts, Dr. Oost and Dr. Silver, that you simply have to prove, they have to prove, and Judge O'Toole accepted this, that there could be variations in the pools of each employer, the test takers at Lowell and Lawrence and Worcester and the MBTA, that would result in statistical anomalies. In theory, great point, but did any of your experts say that given the deviation from what the normal distribution curve of outcomes would be here, that given this large a deviation, it's plausible to think that these type of differences from town to town could account for that much, could drive it? I didn't see that certainly in Oost's testimony, but you had a statistician. Did he address that point? No, he did not address that point, Your Honor, but what his testimony was, was that there were statistical anomalies that came up all the time in this type of analysis, and that in aggregating the data, just to step back a second, in disparate impact case, you've got the test and you've got the pool of test takers, and the law provides that if there is a disparate impact shown, regardless of where that impact arises from, the test or the test takers, then it's actionable. But with the aggregation, the point of the experts, which was adopted by Judge O'Toole, was that the pool of test takers can vary, and that that variance from one pool to the next can have shown disparate impact. The plaintiffs agree with you. A variation in the population basis in a different town could account for difference in incomes, so everybody agrees on that. But does anyone on your side testify that in this case, with this type of disparate impact, that variance could account for the impact? In other words, you actually could have, if you accounted for that variance, you'd end up with a random distribution. I didn't see that. You're right. If you look at exhibit number 198, I believe it is. Excuse me for one second. Yes, which was 198, which is the record page 4860. Dr. Utz came up with an example of what could happen, just the type of situation. And they agree with you. It could happen. You could have an example. It could happen. And it could happen in a very straightforward fashion. But could it happen in this case, given these outcomes, okay? No one testified to that specifically, but I think it was a given, Your Honor, that these types of situations are not unique. The example from Dr. Utz that is in exhibit 198 hypothesizes very simple facts, where you have minority and white test takers that 50% of the minorities passed in one jurisdiction and one-seventh passed in the other jurisdiction. The adverse impact ratio was one, meaning there was no adverse impact. In either one of these two jurisdictions, when you aggregate the numbers and set up the ratio, you come up with an adverse impact ratio of 0.75. So there is adverse impact. And he said that that was a type of situation that could result because of the anomalies in aggregation. And when you take the different poles that exist in these small jurisdictions that we have, you're imposing the disparate impact that does legitimately exist in one jurisdiction onto another. For example, Your Honor, in... But that's like one precinct in Boston onto another precinct in Boston. And we do that in this. We do that, Your Honor, but the disparate impacts, Title VII speaks to employers and the selection process of an employer. And it's the plaintiff's burden under Title VII to prove that that employer had a disparate impact in that selection. So you're saying your client could be held liable if two other towns really had a big impact. Correct. But you're all doing the same thing. In a disparate treatment case, that would make a lot of sense. But in a disparate impact case, since you're all using the same selection tool, how would you account... How do you discount the possibility that simply the tool is acting in the same way in other jurisdictions? You've got small numbers, so you're going to see outliers in terms of some may have a big impact, some don't, but it's the same tool doing the same thing marginally in every jurisdiction. It's the same tool but not necessarily doing the same thing because the pool of people taking that test in Worcester is different than it is at the MBTA, is different than it is in Lowell. And the law requires that the plaintiff prove that in Lowell or in Worcester or at the MBTA that there is disparate impact. And they can't prove that based upon the small numbers that they've got here. As the rule of one that Dr. Silva talked about and Dr. Utz talked about, the Simpsons Paradox and various other anomalies, they can't do that with the small numbers that exist here. So they go to the aggregation mode. But as Judge O'Toole indicated, what that does is it allows... One of the experts gave the example of the same test administered at Alcoa and the same test administered at Fowler. Do you concede the point made by Plaintiff's counsel that even if you eliminate aggregation over time within a town and just rely on aggregation across jurisdictions, you get a significant impact? I do not, Your Honor. Okay, what do you point us to in the record that shows us that there would be... I point you to Exhibit 78 at the record page 4308, which is the adverse impact on pass-fail. And the next page, 4309, is the adverse impact on appointment. And it assumes the statewide exams. It is aggregated data. And on the appointments, three of the four years, the probability value exceeded .05. So there was statistically insignificant. So we strongly disagree with that. So even if aggregation is recognized, the statewide exams on a number of these factors, and there are four factors involved, the passing rate, the effective passing rate, the mean test score, and the promotion rate, there is not a statistically significant adverse impact. And on that point, we don't have any fact-finding by direction tool. Correct. Because he didn't get to that issue because he found that there should be no aggregation. And he adopted the positions of both Dr. Silva and Dr. Utz in reaching that conclusion, Your Honor. And that is, that conclusion is a finding of fact. And that's clear error. This court said that in the Fudge case, that in judging whether aggregation was appropriate there, the court referred to it as a clear error standard. I'd also point out that the plaintiffs indicated that in the Jones case recently decided by this court, this court had affirmed aggregation as the appropriate way to proceed in that case. In fact, what happened in that case was it was a summary judgment decision that was on appeal, and the employer raised the issue of aggregation but didn't raise it in the trial court. And this court said, no, we're not going to look at aggregation, we're going to accept aggregation, but for that procedural reason, because it hadn't been challenged in the trial court, not because they found a rule that it was the appropriate way to handle the issue in that case. The plaintiffs also, Your Honor, referred to the Page case, which is a Ninth Circuit, California case, where aggregation was addressed in that case. The trial judge had found that aggregation should be used and went up on appeal. It was treated as a clear error standard, and the Ninth Circuit affirmed based upon the clear error rule. And I think the facts of that case are very educational when compared to the facts of this case. That was the California Highway Patrol was the defendant, and they had given three exams to various levels of officers in the California Highway Patrol. And the court, again, the district court affirmed on the clear error standard by the Ninth Circuit, held that that was appropriate. But there, it was the same employer, and it was very similar pool of test takers because it was California Highway Patrol officers at various rank levels. So that's the type of situation where aggregation may be warranted, but in this case, based upon the opinions of the experts, Judge O'Toole was correct in hoping that it was not warranted, certainly correct under the clear error standard, Your Honor. Thank you. Your Honor, another situation that exposes the problems with aggregation is the University of California case. It was referred to as a case, I'm not sure whether it was a legal case or not, but by one of our experts. And it was a challenge by a group of women who applied to the graduate school at the University of California at Berkeley. And they did bring suit, ultimately, and claimed that there was some discrimination against them. And nobody could figure out initially, and what the statistician said was the issue was that the women tended to apply to the more difficult graduate schools, where the men applied, in this case, to the easier schools. And so even though on those specific set of applications to the math department on the one hand and the history department on the other hand, the males and females were treated in exactly the same way, when you aggregated that data, it looked like the females were treated adversely because of the fact that they had applied to the more difficult schools. And in fact, the adverse impact was one for both groups. And that's the circumstance that we have here. If we aggregate across groups, different pools, different test takers, then we're imposing the potential adverse impact from one jurisdiction onto another where that hasn't been earned by that other jurisdiction. Thank you, Your Honor. Thank you. Sorry. Ms. Brown. Yes. Good afternoon. May it please the Court, I'm arguing on behalf of the City of Lowell. The City of Lowell has an additional judgment that is not shared by any of the other defendants, and so I wanted to bring your attention to that and address it here, and that is the issue of standing. There's just one plaintiff whose allegations pertain to Lowell, his name is Robert Alvarez, and his purported basis for the suit is that he's Hispanic. The district court correctly found that he is not Hispanic, and so he has no standing to bring the suit against Lowell. So there are two issues. One, what's the applicable definition? As I understand it, he's Filipino. His father was born in the Philippines. Well, do you realize that there were a substantial number of Hispanics in the Philippines, and that they considered themselves Hispanics to a certain extent? This is a difficult problem, but I just thought I would raise it. Yeah, no, I understand this is a difficult problem, and I do know that the Philippines was a Spanish colony for a long time, hasn't been for over 100 years. There is still a substantial, well, I don't know about substantial, but there are still a number of Filipinos who have a Hispanic background and, in fact, speak Spanish. Yeah, I know this isn't in the record. I would say it's not that substantial. But I don't disagree that there are some people of that. The question then is, you know, would somebody related to such a person by bare blood, who had never met the person, never spent any time with them, was not raised in a Spanish-speaking home, lived all of his life in the United States, was born in Boston, but does have a bloodline, if you will, to the Philippines, does that person meet the definition of Hispanic that should be used in this case? What exactly is the test you propose federal courts use to determine a person's race when the person claims to be of a certain race? Well, I think the district court got it right, and that the definition that should be used in this case is the HRD definition, because this is a civil service case. The HRD, you know, has used that definition of Hispanic for decades. It has been, if you will, blessed by the district, by the first circuit court through the Castro Consent Decree. So the government decides what people's races are. That's the proposition you're putting forward. Well, I'm going to say that, you know, you've got to do it some way, right? So often there's self-identification, but I don't think anyone seriously believes that just because you check a box that makes it so. So even the EEOC guidelines require documentation that sort of substantiates one's self-identification. And I would say with respect to self-identification also, the district court made a factual finding that Mr. Alvarez did not always have, his self-identification is mixed. Sometimes he would identify as white. Sometimes he would identify as Hispanic. And even when there was an option to identify as white. How will it really be necessary to resolve this issue? I don't know. Only if all of the other defendants are wrong in their positions, correct? Yes. Is it needed to take the time of this court to argue a standing question? Well, the lower court did make a specific finding on it, and I would like to say my piece as to why that finding of the lower court was warranted. But I can be very brief. Do you have anything to add as to the merits-based argument? I'll just give you the definition that the HRD uses. Quote, individual whose family originates from a Spanish-speaking country in the Western Hemisphere and who either speaks Spanish or who was raised in a household where Spanish was the primary language. So it's a definition that is essentially trying to capture the national origin and ethnicity components of Hispanic that make it quite a difficult category, I guess, to define. Mr. Alvarez doesn't meet either part of the definition. He doesn't originate from a Spanish-speaking country in the Western Hemisphere or any hemisphere, doesn't speak Spanish, and wasn't raised in a household where Spanish is the primary language. That's the definition of Hispanic that the lower court found appropriate in this case. It's a civil service case. That's the definition. The classifications aren't that issue in this case. What's at issue is the text. Nobody has challenged the classification definitions except perhaps by implication insofar as there's any rebuttal to the argument on our part against Mr. Alvarez. So I would submit that plaintiffs haven't offered an alternative definition. Even the line in their brief that purports to offer an alternative definition is not met by Mr. Alvarez, and the lower court's finding on that matter should be upheld as well. Thank you for your time. Thank you. Mr. Norris. Good afternoon. I'm Tim Norris. I represent the city of Worcester. Worcester argues separately to point out two things. First of all, none of the ways in which the plaintiffs seek to cherry pick different statistics to find adverse impact work for the city of Worcester. How's this different than the aggregate point we just heard about? Well, Your Honor, I think that one of the questions that was asked, and I think it pertains to Worcester's situation, is, you know, were there any of these anomalies or paradoxes found in this case? And I think Worcester points up exactly that type of a paradox. So you all just decided we should hear from two people rather than one on the aggregation issue. One's going to elaborate further. Well, Your Honor, you know, I think that Worcester presents a little bit of a different situation in that its individual data demonstrated that minority candidates actually scored higher on average than non-minority candidates in some of the tests. That's just the aggregation factor. If you can aggregate, then so be it. That's a result you get. If you can't aggregate, then you don't even get to this issue. Well, Your Honor, you know, I know that we all did, you know, parcel at the time to speak, you know, generally about the issues affecting all of us, but also about the issues affecting our individual municipalities. In Worcester's case, you know, they are one employer. They don't have access to the data, you know, affecting other employers. And essentially, you know, they make the decisions they make as an employer. And, you know, Worcester has been held into this case despite the fact that based on selection, based on average score, based on any of the tests as applied to Worcester as an employer, there are no adverse impacts. And so, you know, there's a variation on the aggregation argument to be sure, but it's also an argument really about the, you know, absurdity created for one municipality, you know, by taking, you know, this aggregation argument and attempting to, you know, swamp the boat with larger municipalities. I mean, Worcester could hire all minority candidates and their numbers would still be swamped by larger municipalities like Boston. So... But then there'd be no plaintiff. I'm sorry? If every single minority were promoted, there'd be no plaintiff. Well, every single minority... So perhaps there would have been even more. Well, I think the argument would be made if Worcester hired, you know, a minority candidate and didn't hire another minority candidate, that that other minority candidate should have been promoted. But the point is the employer, Worcester as an employer, can only control its own selection process. It can't control how that selection process is delivered in other communities. And in this case, you know, Worcester, like Boston, like some of the other communities, did, and the record shows that it did, you know, take action to try to level the playing field by offering task preparation assistance and so forth. And, you know, in Worcester's case, because it's a smaller department, you know, we submit that that had an impact and that that had, you know, the result that it had in Worcester, which was that the, you know, the selections made by Worcester, you know, did not adversely impact minorities to the extent that can be determined through the statistical evidence. If there are no further questions, I will rest my brief. Thank you. Mr. Wilson. Sir. Good afternoon. Good afternoon, Your Honors. Anthony Wilson for the City of Springfield. May it please the Court. I'm going to make some brief comments on the City of Springfield's brief relative to aggregation. The City of Springfield is in an interesting position in that there are only two years in which the City of Springfield used an immediate HRD test. In this case, that's going to be 2005 and 2007. The only one of those years in which there was any indication of any adverse impact would be the year 2005. Now, relative to aggregation across the court's determination, judge's pool's determination was that the population, the pool of candidates that you're looking at, you cannot make a statistically significant determination that there was a disparate impact on the African American or Hispanic test takers in that pool. That, again, brings up the aggregation argument that the appellants are making. Essentially, Your Honor, there was evidence before the lower court that suggested that using an aggregated analysis was not appropriate in this case. Specifically, I don't have the site in the appendix. However, if you look at the City of Springfield's brief at page 27, we quote from Dr. Silva, who during the lower court trial is talking about aggregation states, it is more often than not leads to false indications of adverse impact. In 82% of the individual jurisdictions that promotion tested for the position of police sergeant between 2005 and 2008, the likelihood of finding a false indication of adverse impact would have been very high, even in the absence of group performance difference. For the reasons cited, a statistical significance test within each jurisdiction in the exam year is the only fair process. A false indication of adverse impact occurs by design only 5% of the time in statistical significance testing. There has been a lot of conversation today, Your Honor, about who is the burden of proving that aggregation is the appropriate analysis. It's been consistent in disparate impact cases that the burden remains on a plaintiff to prove all of the elements of their claim. In this case, they've raised the point of aggregation. It was addressed in the lower court, and they never rebutted the evidence that suggested that it was not the appropriate kind of analysis. And whether aggregation is appropriate or not is not the domain of the court, it's not really the domain of the lawyers. That is an area on which the experts are going to have the primary base of knowledge. Therefore, the only way for this court to overturn that determination of whether or not it was appropriate to use aggregation can only be overturned on clear air. On that, I rest on my briefs. Thank you. Thank you. I don't know how much time you have, but it's not much. I'll be very brief, Your Honor. I just want to spend my two minutes concentrating on a question that hasn't been talked about much, which is less discriminatory alternatives. As I said, the judge made three legal errors that prevented him from getting to the issue of less discriminatory alternatives. The alternative that we were suggesting and still suggest is that if the multiple-choice job knowledge test with the E&E rating had been used simply as a hurdle, not as a scored device, and then not picked people randomly, as you suggested, Judge Tejada, but then you used some of these other tests that Dr. Butts testified so eloquently about, reduced substantially adverse impact but still add validity because you're adding components to the test. And the more you add components, the more validity you have. You would then have a situation which would almost certainly produce significantly less adverse impact and have more validity. And if you read Dr. Butts' testimony at pages 2086, 2087, and 2088, he talks directly about the experience that he had in Bridgeport, substantially reducing adverse impact by adding these components. He talks about his experience in Detroit by eliminating the written test altogether, which he thought was fair to do, and using these other tests and having significantly less adverse impact. And he also talks about, and I'll quote this, that if you use situational judgment tests, even if they're written tests but they're not multiple-choice rote memory tests, that is, and I'm quoting now, putting it in the context of making it real to the actual job that they have to be performed, minorities tend to perform better on such tests that if that same information is asked for in a written multiple-choice job knowledge test, is that right? And his answer was, that is correct. What do you do about his testimony that the narrow window here, the large number of people for a small number of positions in Boston meant that no matter which one of these tests used, you're going to have a big disparate impact? Well, first of all, you don't know what the numbers are because you don't know what retirements are. But the burden is on you. No, no, but there's evidence that generally they promote up to 25 or 40 people at one time. So let me finish. If you use it as a hurdle and then you have these other components, including reviewing someone's performance, how they've done on the job, their integrity, their conscientiousness, their interpersonal skills, their communication skills, and that is the deciding factor, which would have been the deciding factor if they had used banding. They weren't just going to pick randomly if they had used banding. One has every reason to believe, and Dr. Udso testified, that you would get more minorities in the mix because you're not knocking out so many minorities by having it done in strict rank order fashion. And that is a less discriminatory alternative. We've demonstrated it. And Judge Udso never got to it because he made these three legal errors that never let him get to that question. Thank you, Pat. Thank you very much. And I will take the opportunity to thank all of you.